This Opinion is a
Precedent of the TTAB

Mailed: April 4, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*Noble House Home Furnishings, LLC*
*v.*
*Floorco Enterprises, LLC*

_____

Cancellation No. 92057394

_____

Anthony O. Cormier of the Law Offices of Anthony O. Cormier,
    for Noble House Home Furnishings, LLC.

Brian D. Walker of Howison & Arnott, L.L.P.,
    for Floorco Enterprises, LLC.

_____

Before Bergsman, Wolfson and Heasley,
    Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

Noble House Home Furnishings, LLC ("Petitioner") seeks to cancel Registration

No. 4049441 for the mark NOBLE HOUSE, in standard character form, for

"furniture," in Class 20, owned by Floorco Enterprises, LLC ("Respondent").[1] On

---

[1] Registration No. 4049441 issued on November 1, 2011. The registration issued from Application Serial No. 76685744 filed on January 14, 2008, based upon Respondent's allegation of a *bona fide* intention to use the mark in commerce under Section 1(b) of the Trademark Act. The application was published for opposition on May 7, 2008. A Notice of Allowance was issued on August 19, 2008. On August 18, 2011, after five extensions of time to file a Statement of Use, Respondent filed a Statement of Use.

March 3, 2015, the parties filed a stipulation permitting Petitioner to file its second amended petition for cancellation asserting abandonment and fraud.[2] Respondent, in its Answer, denied the salient allegations in the Second Amended Petition for Cancellation.[3] On July 31, 2015, after the close of trial,[4] Petitioner filed a motion for leave to file an amended petition for cancellation.[5] By this motion, Petitioner seeks to add the claim that Respondent's application that issued as the registration sought to be cancelled was void *ab initio* because Respondent was not the owner of the mark. The underlying issue presented by Petitioner's motion and the operative pleading in this proceeding is whether use of the mark by Respondent's parent corporation inures to the benefit of Respondent.[6]

Although we deny Petitioner's motion to amend the petition for cancellation to assert a claim challenging ownership of the subject registration, we grant the petition on the ground of abandonment as discussed below.

I.   *Petitioner's motion for leave to amend the petition for cancellation.*

Petitioner seeks to add a claim that Respondent was not the owner of the mark at the time Respondent filed its application. We construe the motion to be based on

---

[2] 24 TTABVUE. Testimony and evidence designated as confidential will be indicated by the designation X TTABVUE (Confidential).

[3] 22 TTABVUE.

[4] Pursuant to the January 9, 2015 trial order, Respondent's testimony period closed on June 14, 2015 and Petitioner's rebuttal testimony period closed on July 29, 2015. 18 TTABVUE 10.

[5] 44 TTABVUE.

[6] The parties refer to Furnco International Corporation and Furnco International (Shanghai) Company Ltd. interchangeably to mean Respondent's parent corporation. We refer to Respondent's parent company as Furnco International Corporation.

the assertion that the claim was tried by implied consent in accordance with Fed. R. Civ. P. 15(b).

The papers submitted by the parties do not persuade us that Respondent knew or agreed that the newly asserted claim--Respondent never used the mark because the mark was used by Respondent's parent corporation--was being tried. Therefore, Respondent would be prejudiced if Petitioner's claim that Respondent's application was void *ab initio* were to be decided on the present record because Respondent has had no opportunity to present evidence on this issue to refute or explain the testimony and other evidence on which Petitioner relies in support of this ground.

For reasons set forth below, we find both that Respondent did not know or agree that the newly asserted claim--concerning who owned the mark when it filed its application--was being tried, and that the motion to amend was not timely filed.

1. At the time Petitioner filed its Second Amended Petition for Cancellation, it was on notice of the facts supporting the claim that the Respondent's application was void *ab initio*. Petitioner argues that "[b]ecause the ownership challenge arises out of the lack of use contention already contained in the Second Amended Petition for Cancellation, justice requires that [Petitioner] be able to argue that [Respondent] does not own the mark in view of the organizational documents first produced on June 10, 2015 and that the registration is void for this reason."[7] We find, to the contrary, that Petitioner's argument raises the question as to why Petitioner did not specifically add the

---

[7] 49 TTABVUE 8.

claim that Respondent's application was void *ab initio* when it filed the Second Amended Petition for Cancellation if its above-noted argument were true. The allegations contained in paragraphs 17-20 address the purported non-use (1) by Respondent of the applied-for mark and (2) for the product depicted in the specimen attached to the Statement of Use, not whether Respondent was the proper owner of the mark, and these allegations did not put Respondent on notice that an ownership claim was alleged.

2. Petitioner had information during the discovery period which should have led it to file a motion to further amend the petition to cancel prior to the opening of its trial period on March 16, 2015, or at the very least to inquire further during discovery as to the use and ownership of the mark. For example, during the Rule 30(b)(6) discovery deposition of Respondent, taken on February 25, 2015, Mr. Richie Berry, Respondent's Operations Manager, identified two invoices from Furnco International Corporation to LG Sourcing, Inc. [Lowe's] for the sale of a bathroom vanity, the product displayed in Respondent's specimen of use.[8] Mr. Berry testified that Furnco International Corporation controls Respondent's operations, that Respondent served as a servicing warehouse for Furnco International Corporation, that furniture products were shipped directly from Furnco International Corporation to Lowes, that the goods did not move through Respondent's Kentucky warehouse, and that the

---

[8] 33 TTABVUE 35-38.

transaction was between Furnco International Corporation and Lowes. 33 TTABVUE 35 and 41.

3. Petitioner also argues that it ultimately learned about the relationship between Furnco International Corporation and Respondent when Respondent introduced its Operating Agreement. We do not find this to be a persuasive reason for the late filing of the proposed amended petition for cancellation. As to the relationship between Furnco International Corporation and Respondent, Mr. Berry testified in his discovery deposition that Furnco International Corporation is Respondent's parent company, although he clearly was not familiar with the legal status of that relationship. This is consistent with Respondent's response to Petitioner's Interrogatory No. 11 wherein Respondent stated that "Furnco International (Shanghai) Co., Ltd is the parent company of the [Respondent]." Respondent was consistent throughout the proceeding that Furnco International Corporation was its parent. If Petitioner was not satisfied with the information it received during discovery, its remedy was to take further discovery, or file a second motion to compel discovery, followed by, if appropriate, a motion to amend the petition based on information obtained through discovery. The filing of the motion to amend the petition for cancellation after trial was untimely.

Thus, we cannot accept Petitioner's argument that it was not apprised of any possible basis for its proposed claim that Respondent was not the owner of the NOBLE HOUSE mark and that the application was void *ab initio* until Respondent

filed its notices of reliance. Despite having received the discovery responses indicated above, Petitioner failed to move to further amend the pleadings at that time, or to inquire further to determine whether it could make an additional claim. We find that Petitioner unduly delayed by waiting until July 31, 2015 to file its motion. Petitioner's motion under Federal Rule 15(b) to amend the pleadings is denied.

## II. The Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), Respondent's registration file. The parties stipulated that testimony may be introduced by affidavit or declaration in lieu of testimonial depositions[9] and that the documents exchanged during discovery are authentic and may be made of record by either party.[10] The parties introduced the testimony and evidence listed below:

### A. Petitioner's Evidence

1. Notice of reliance on official records of the USPTO, including a copy of Petitioner's application Serial No. 85965786 for the mark NOBLE HOUSE HOME FURNISHINGS and design for "on-line retail store services featuring furniture and home furnishings," in Class 35, and "warehousing services, namely, storage, distribution, pick-up, packaging, and shipping of furniture and home furnishings," in Class 39.[11] In addition, Petitioner included a copy of the October 4, 2013 Office Action

---

[9] 19 TTABVUE.

[10] 27 TTABVUE.

[11] 29 TTABVUE 5. The copy of the application was printed from the TSDR USPTO database.

wherein the Trademark Examining Attorney refused to register Petitioner's mark NOBLE HOUSE HOME FURNISHINGS and design under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Petitioner's mark so resembles the mark NOBLE HOUSE in Registration No. 4049441, the registration sought to be cancelled, as to be likely to cause confusion.[12]

2. The testimonial deposition of Marshall R. Bernes, Petitioner's Chief Executive Officer, with attached exhibits.[13]

3. Notice of reliance on Respondent's responses to Petitioner's Requests for Admission.[14]

4. Notice of reliance on Respondent's responses to Petitioner's Request for Production of Documents.[15]

5. Notice of reliance on the discovery deposition of Richie Berry, Respondent's Operations Manager, with attached exhibits.[16]

6. Notice of reliance on Respondent's responses to Petitioner's Interrogatories.[17]

7. Notice of reliance on official records from the Commonwealth of Kentucky relating to Respondent's status.[18]

---

[12] 29 TTABVUE 19.

[13] 30 TTABVUE.

[14] 31 TTABVUE.

[15] 32 TTABVUE.

[16] 33 TTABVUE. The exhibits that were not designated confidential were filed at 36 TTABVUE. The exhibits that were designated as confidential were filed at 38 TTABVUE (Confidential).

[17] 34 TTABVUE.

[18] 37 TTABVUE.

8. Notice of reliance on documents identified in Respondent's responses to Petitioner's Interrogatories and designated confidential.[19]

*B. Respondent's Evidence*

1. Notice of reliance on official records from the Commonwealth of Kentucky relating to Respondent.[20]

2. Testimonial declaration of Richie Berry, Respondent's Operations Manager, with attached exhibits.[21]

## III. Standing

Marshall R. Bernes, Petitioner's Chief Executive Officer, testified that since shortly after December 28, 2011, Petitioner "has been engaged in the sale of furniture throughout the United States using the mark NOBLE HOUSE HOME

---

[19] 39 TTABVUE (Confidential).

[20] 43 TTABVUE.

[21] 42 TTABVUE (Confidential). Mr. Berry's testimonial declaration and attached exhibits were designated as confidential. However, Respondent over-designated the testimony and exhibits as confidential. For example, Mr. Berry's title as "Operations Officer," Respondent's status as a limited liability company organized under the laws of the Commonwealth of Kentucky, and Respondent's status as a wholly-owned subsidiary of Furnco International Corporation are not confidential. Fed.R.Civ.P. 26(c)(1)(G) protects confidential, trade secret, and commercially sensitive information by allowing a party to limit the access to trade secret or other confidential information or by permitting the information to be revealed only in a designated way. The Advisory Committee Notes to the 1970 Amendment explain that the Rule does not provide complete immunity against disclosure; rather, in each case, the need for privacy must be weighed against the need for disclosure. In rendering our decision, we will not be bound by Respondent's designation. It is intended that the filings in Board proceedings be publicly available and the improper designation of materials as confidential thwarts that intention. It is more difficult to make findings of fact, apply the facts to the law, and write decisions that make sense when the facts shown by the evidence may not be discussed. The Board needs to be able to discuss the evidence of record, unless there is an overriding need for confidentiality, so that the parties and a reviewing court will know the basis of the Board's decisions. Therefore, in this opinion, we will treat only testimony and evidence that is truly confidential or commercially sensitive as such.

FURNISHINGS and DESIGN."[22] Mr. Bernes also testified that Petitioner's previously-filed, and now abandoned, application Serial No. 85676131, and its currently pending application Serial No. 85965786 both for the mark NOBLE HOUSE HOME FURNISHINGS and design were refused registration under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that the mark so resembles Respondent's NOBLE HOUSE mark (Registration No. 4049441) as to be likely to cause confusion.[23]

Respondent, in its brief on the case, does not challenge Petitioner's standing. In fact, Respondent acknowledges that Petitioner filed an application to register its mark NOBLE HOUSE HOME FURNISHINGS and design, that the application has been refused registration, and that "due to the refusal of registration of [Petitioner's] mark, [Petitioner] now brings these Cancellation Proceedings before the Board."[24]

This testimony and evidence is sufficient to show that Petitioner has a real interest in this proceeding and, therefore, has standing. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000) (petitioner owned prior registrations for "Laser" mark for golf clubs and golf balls, and these registrations and products sold under marks suffice to establish petitioner's direct commercial interest and its standing to petition for cancellation of respondent's "Laserswing" mark for golf clubs); *International Order of Job's Daughters v. Lindeburg & Co.*, 727

---

[22] Bernes Testimony Declaration ¶3 (30 TTABVUE 5).

[23] Bernes Testimony Declaration ¶¶4-9 (30 TTABVUE 5-6).

[24] 53 TTABVUE 6.

F.2d 1087, 220 USPQ 1017, 1020 (Fed. Cir. 1984) (finding sufficient the petitioner's production and sale of merchandise bearing the registered mark); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982) ("Thus, to have standing in this case, it would be sufficient that [plaintiff] prove that it filed an application and that a rejection was made because of [defendant's] registration.").

## IV.     *Abandonment*

Under Section 45 of the Trademark Act of 1946, 15 U.S.C. 1127, a mark shall be deemed abandoned:

> (a) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in the mark.
> …

There are two elements to an abandonment claim: non-use of the mark and intent not to resume use. Because registrations are presumed valid under 15 U.S.C. § 1057, the party seeking cancellation based on abandonment bears the burden of proving a *prima facie* case by a preponderance of the evidence. *Quality Candy Shoppes/Buddy Squirrel of Wisconsin Inc.* v. *Grande Foods*, 90 USPQ2d 1389, 1393 (TTAB 2007) (citing *On-Line Careline Inc.* v. *America Online Inc.*, 229 F.3d 1080, 56 USPQ2d 1471 (Fed. Cir. 2000)). If plaintiff can show three consecutive years of nonuse, it has established a *prima facie* showing of abandonment, creating a rebuttable presumption that the registrant has abandoned the mark without intent to resume use. The burden of production (*i.e.*, going forward) then shifts to the respondent to

produce evidence that it has either used the mark or that it has intended to resume use (*e.g.,* a convincing demonstration of "excusable non-use" that would negate any intent not to resume use of the mark). The burden of persuasion remains with the plaintiff to prove abandonment by a preponderance of the evidence. *See Imperial Tobacco Ltd. v. Philip Morris Inc.,* 899 F.2d 1575, 14 USPQ2d 1390, 1393 (Fed. Cir. 1990); *On-line Careline,* 56 USPQ2d at 1476; *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.,* 892 F.2d 1021, 13 USPQ2d 1307, 1310 (Fed. Cir. 1989); *J.G. Hook, Inc. v. David H. Smith, Inc.,* 214 USPQ 662, 665 (TTAB 1982) (citing *Burroughs Wellcome Co. v. Warner-Lambert Co.,* 203 USPQ 191 (TTAB 1979)).

The key dates and events are set forth below:

1. On January 14, 2008, Respondent filed an intent-to-use application to register the mark NOBLE HOUSE for furniture;

2. On August 18, 2011, Respondent filed its Statement of Use declaring that it was using the mark in commerce at least as early as December 3, 2010. The registration issued on November 1, 2011; and

3. The last sale of furniture under the NOBLE HOUSE mark was July 14, 2009. Thereafter, the products were sporadically marketed, but no sale was executed.[25]

---

[25] Respondent's responses to Petitioner's Requests for Admission No. 8, 10, 12 and 13 (31 TTABVUE 7-9); Berry Discovery Deposition (33 TTABVUE 33, 36 and 38 and Exhibit J at 38 TTABVUE (Confidential) 50); Respondent's responses to Petitioners' Interrogatory No. 1 ("there are no unit volume and dollar volume of sales since 2010") (34 TTABVUE 6) and No. 3 ("Furniture goods bearing the Subject Trademark have not been distributed since the sales of bathroom vanities to Lowes in 2009" and "Last sale of furniture goods bearing the Subject Mark was in 2009.") (34 TTABVUE 7).

Even though the period of nonuse began on July 14, 2009, Petitioner cannot assert a three-year period of nonuse that began prior to Respondent's filing of its statement of use because an intent-to-use applicant need not use its mark until it files a statement of use. *Consolidated Cigar Corp v. Rodriguez,* 65 USPQ2d 1153, 1155 (TTAB 2002). Because "use in commerce" means that the mark is placed on the goods and "the goods are sold or transported in commerce," *see* Section 45 of the Trademark Act, 15 US.C. § 1127, advertising and marketing without sales or transporting goods is not use of the mark. Thus, for our purposes, the period of nonuse commenced August 18, 2011, and the testimony and evidence demonstrating nonuse of the mark since August 18, 2011 establishes Petitioner's *prima facie* showing of abandonment.

However, nonuse due to lack of demand may not constitute abandonment if the trademark owner continues its marketing efforts. *See, e.g., American Lava Corp. v. Multronics, Inc.,* 461 F.2d 836, 174 USPQ 107, 110-11 (CCPA 1972); *Daybrook-Ottawa Corp. v. F.A.B. Manufacturing Co.,* 152 USPQ 441 (TTAB 1966) (failure to make any sales of trademarked product for nearly four years did not result in abandonment of rights in mark since owner, on a number of occasions, quoted prices on and attempted to effect sales of product, and failure to make sales was occasioned by lack of demand for product rather than intent on owner's part to abandon sale thereof under mark). In this case, Respondent asserts that it has been marketing and advertising NOBLE HOUSE furniture as available for sale.

As discussed below, the problem with Respondent's marketing and advertising is that Respondent's parent entity, Furnco International Corporation, not Respondent,

marketed and advertised the NOBLE HOUSE products. Moreover, Respondent's parent company, Furnco International Corporation, not Respondent, controlled the nature and quality of the NOBLE HOUSE furniture that may have been sold prior to commencement of the period of non-use.

*A.    Post August 18, 2011 marketing and advertising.*

With one exception discussed below, none of the marketing or advertising proposals identify or even refer to Respondent as the source of the furniture products:

> Q.    Directing your attention to the first page of this PowerPoint presentation,[26] the page that has Bates number 000706 where the name Furnco International appears, did that name Furnco appear on the first page of all the PowerPoint presentations that were sent to customers concerning Noble House branded furniture?
>
> A.    Yes, to my knowledge.
>
> Q.    Is it your understanding that none of the PowerPoint presentations sent to customers concerning Noble House branded furniture had the name [of Respondent] on the first page of the cover sheet?
>
> A.    To my knowledge, yes.[27]

The cover page of all the proposals displays the Furnco International Corporation logo. The proposal to Menards, shown below, is representative.[28]

---

[26] PowerPoint is a registered trademark owned by Microsoft Corporation (Registration No. 4247252 registered on November 20, 2012).

[27] Richie Berry's Discovery Dep. (33 TTABVUE 73-74).

[28] Richie Berry Discovery Dep. Exhibit M (38 TTABVUE (Confidential) 59). This exhibit was improperly designated as confidential inasmuch as it was sent to a third party without any indication that there was a nondisclosure agreement and the recipient was identified in the publicly available discovery deposition of Richie Berry. *See also* the exhibits attached to 39 TTABVUE (Confidential).



Bath Vanity with Mirror

Q.      What is it?

A.      A PowerPoint presentation to Menards.

Q.      And whose PowerPoint Presentation is this? Who prepared it?

A.      This would have to come from Furnco.[29]

*      *      *

Q.      Is it correct that there was no one at [Respondent] who hand-delivered or mailed the Menard's proposal to Menard's?

A.      For furniture, not to my knowledge.[30]

A second proposal to Menards for TV consoles[31] included a page entitled "Why Furnco International?"[32] This page explains that Furnco International Corporation has an experienced management team that has the ability to produce quality

---

[29] Richie Berry Discovery Dep. 33 TTABVUE 39-40.

[30] Richie Berry's Discovery Dep. 33 TTABVUE 55.

[31] Richie Berry's Discovery Dep. Exhibit N (38 TTABVUE (Confidential) 74). This exhibit also was improperly designated as confidential.

[32] *Id.* at 86. *See also* Richie Berry Discovery Dep. Exhibit T (38 TTABVUE (Confidential) 106 at 121)

furniture.[33] In addition, Furnco International Corporation touts its strong presence in the U.S., including "a very professional servicing warehouse in Kentucky." The Kentucky servicing warehouse is operated by Respondent.[34]

In an October 24, 2012 introductory email to a potential customer, Richie Berry, Respondent's Operations Manager, identified himself as an employee of Furnco International, "a large furniture, kitchen cabinets and hardwood flooring manufacturer, with an office located in Bardstown Kentucky."[35] Mr. Berry provided the following information:

> We are a company of great styling innovation utilizing our knowledge we have gained in the market place. We are eager to make custom constructed pieces for your needs. We have the ability to do private label or currently we have the following brands that belong to us in the market, NobleHouse and Heritage House.
>
> I feel what truly makes our company special is not one particular thing, but a combination of many things. We at Furnco do not look for "customer" [sic], but more importantly, we look for business partners.

---

[33] Furnco International Corporation manufactures and distributes all of the furniture displayed in the marketing and advertising materials. Richie Berry Discovery Dep. 33 TTABVUE 84.

[34] *See* Richie Berry Testimony Declaration ¶10 (42 TTABVUE (Confidential) 5); Respondent's Notice of Reliance Exhibit A, a cover email to a prospective customer explaining that "[o]ur sales and service office is located in Bardstown, Kentucky." (43 TTABVUE 36).

[35] Richie Berry Discovery Dep. Exhibit R (38 TTABVUE (Confidential) 100-101) (designated as confidential). Respondent also introduced this document in Respondent's Confidential Notice of Reliance Exhibit D (42 TTABVUE (Confidential) 445-446). Respondent, in its brief, identified this cover letter as emanating from Respondent rather than Furnco International. 53 TTABVUE 19.

Likewise, in a July 14, 2012 introductory email, Mike Jacobs, "vice president of sales and marketing in North America for Furnco International," identified Furnco International as a manufacturer of furniture.[36]

> We are a China-based company who has a tremendous amount of success in the United States developing our market share specifically partnering up with the largest box stores in the country. Our customers include \*\*\* and many others. We do not have a "running line" but rather we custom-develop and design products around the individual needs and price-points of each individual customer. With that we have two available brands Heritage House and NobleHouse or we can private label to your liking.
>
> \*      \*      \*
>
> We also maintain strong presence in the United States with service centers in North Carolina and Kentucky to support our sales with excellent service.

The only reference to Respondent is a September 25, 2013 cover letter from Richie Berry to a prospective customer transmitting the standard proposal displaying the Furnco International logo discussed above.[37] The cover letter was on Respondent's letterhead.

> Q.    Is it true that prior to September 25th, 2013 that [Respondent] did not send any Furnco International PowerPoint presentations to any perspective [sic] customers?
>
> A.    Give me a second. I'm sorry. I'm trying to – I'm trying to think. I'm sure that I have sent e-mails prior to September 25th, 2013 on behalf of Furnco for furniture.

---

[36] Richie Berry Discovery Dep. Exhibit S (38 TTABVUE (Confidential) 100-101).

[37] Richie Berry Discovery Dep. Exhibit V (38 TTABVUE (Confidential) 132). Respondent also introduced this document in Respondent's Confidential Notice of Reliance Exhibit H (42 TTABVUE (Confidential) 477-509). Respondent, in its brief, identified this cover letter as emanating from Respondent rather than Furnco International. 53 TTABVUE 19.

Q.     On behalf of whom?

A.     On behalf of Furnco for furniture side.

Q.     Yes. And that is consistent with my understanding, and I just want to make sure that the picture that I have agrees with your understanding of the facts. All of the prior transmittals from you were from the Furnco e-mail address. The first time you transmit with a reference to [Respondent], as far as the document shows, is this letter. And I just want to verify that's your understanding of the background on this case?

A.     Yes. This letter is the first letter that I have that is a cover -- is an introduction letter with the [Respondent's] name on it. There's been numerous presentations sent out with my Furnco e-mail address.[38]

A customer reviewing the Furnco International furniture proposal, even though it was accompanied by a cover letter on Respondent's letterhead, would likely identify Furnco International as the source of the furniture products.

Respondent identified the following communications as emanating from Respondent rather than Furnco International Corporation:[39]

1.     An August 13, 2013 email and an accompanying marketing presentation. However, the email was sent from Richie Berry's "furnco.com" email address and the marketing presentation was the standard marketing proposal discussed above displaying the Furnco International logo with no reference to Respondent.[40]

---

[38] Richie Berry's Discovery Dep. 33 TTABVUE 83-84.

[39] 53 TTABVUE 19.

[40] Respondent's Confidential Notice of Reliance Exhibit G (42 TTABVUE (Confidential) 468-475).

2.    A January 28, 2015 email and an accompanying marketing presentation. Even though the signature block was "Richie Berry, Furnco/Floorco," in the email, Mr. Berry identified himself as working for Furnco International, a furniture manufacturer. The marketing presentation was the standard marketing proposal discussed above displaying the Furnco International logo with no reference to Respondent.[41]

3.    A January 16, 2015 email and an accompanying marketing presentation. Although the signature block for the cover letter was "Richie Berry, Furnco/Floorco," the marketing presentation was the standard marketing proposal discussed above displaying the Furnco International logo with no reference to Respondent.[42]

We note that these exhibits dated January 16, 2015 and January 28, 2015 are later than the three-year period that establishes Petitioner's *prima facie* case of abandonment. However, they are illustrative of the marketing practices of Furnco International Company and Respondent.

In view of the foregoing, we find that the post-August 18, 2011 marketing and advertising was conducted by Furnco International as the source of the NOBLE HOUSE furniture products.

*B.    Furnco International Corporation, not Respondent, controls the nature and quality of the NOBLE HOUSE furniture.*

Richie Berry testified, *inter alia*, to the following:

---

[41] Respondent's Notice of Reliance Exhibit A (43 TTABVUE 36-64).

[42] Respondent's Notice of Reliance Exhibit B (43 TTABVUE 66-95).

1. "All major decisions of [Respondent] are made with the consent and approval of Furnco International Corporation."[43]

2. "[Respondent] acts as the US operating entity of Furnco International Corporation and acts as a servicing contact for all US operations of Furnco International Corporation."[44]

In his discovery deposition, Mr. Berry also testified that Furnco International Corporation controls the operations of Respondent.[45]

Mr. Berry's testimony is corroborated by Respondent's governing documents. Those documents show that Furnco International Corporation is the sole member of Respondent, a limited liability company organized under the laws of Kentucky.[46] Moreover, Furnco International Corporation is the sole manager of Respondent and the control and management of Respondent is vested in Furnco International Corporation.[47] In fact, Respondent receives its funding from Furnco International Corporation.[48]

---

[43] Richie Berry Testimony Declaration ¶9 (42 TTABVUE (Confidential) 5).

[44] Richie Berry Testimony Declaration ¶10 (42 TTABVUE (Confidential) 5).

[45] Richie Berry Discovery Dep. 33 TTABVUE 31.

[46] Article 1.1 of the Operating Agreement of Floorco Enterprises, LLC (Respondent's Confidential Notice of Reliance, Exhibit A, 42 TTABVUE (Confidential) 10). Paul Tu is the President of Furnco International Corporation (42 TTABVUE (Confidential) 28).

[47] Articles 10.1(a) and (c) of the Operating Agreement of Floorco Enterprises, LLC (Respondent's Confidential Notice of Reliance, Exhibit A, 42 TTABVUE (Confidential) 17-18).

[48] Richie Berry Discovery Dep. 33 TTABVUE 22.

There are no agreements between Respondent and Furnco International Corporation regarding the NOBLE HOUSE mark.[49] In particular, the record does not show the existence of any licensing arrangement between Respondent and Furnco International Corporation that would support Respondent's claim that the use of Respondent's mark by Furnco International Corporation inures to Respondent's benefit.

Because Furnco International Corporation is identified as the source of the furniture products in the advertising and marketing materials and because Furnco International Corporation manufactures the furniture products and is not controlled by Respondent, Furnco International Corporation controls the nature and quality of the goods rendered under the NOBLE HOUSE mark.

C.    *Analysis.*

The question here is whether Respondent is entitled to continue to claim the benefits of its registration. Specifically, the issue to be decided is not whether Respondent or its parent is entitled to use the NOBLE HOUSE mark for furniture in the United States, or even whether Respondent acquiesced in its parent's use of the registered mark. The specific issue before us is whether the use of the mark by the parent entity inures to the benefit of the wholly-owned subsidiary when the parent entity controls the nature and quality of the goods and services.

Section 5 of the Trademark Act, 15 U.S.C. §1055, states, in part, as follows:

---

[49] Respondent's Responses to Petitioner's Interrogatory Nos. 10 and 11 (34 TTABVUE 10); Respondent's Responses to Petitioner's Request for Production of Documents Nos. 13 and 14 (32 TTABVUE 9).

> Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public.

Section 45 of the Act, 15 U.S.C. §1127, defines "related company" as follows:

> The term "related company" means any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used.

Thus, Section 5 of the Trademark Act permits an applicant or registrant to rely on use of the mark by related companies.

The essence of related-company use is the control exercised over the nature and quality of the goods or services on or in connection with which the mark is used. When a mark is used by a related company, use of the mark inures to the benefit of the owner who controls the nature and quality of the goods or services. *Smith Int'l. Inc. v. Olin Corp.*, 209 USPQ 1033, 1044 (TTAB 1981) ("Section 5 of the statute provides that a mark may be used legitimately by related companies, and, if such companies are controlled as to the nature and quality of the goods on which the mark is used by the related companies, such use inures to the benefit of the applicant-owner.").

In most situations, the inherent nature of the parent's overall control over the affairs of a subsidiary will be sufficient to presume that the parent is adequately exercising control over the nature and quality of goods and services sold by the subsidiary under a mark owned by the parent, without the need for a license or other agreement. If there is any doubt on that score in a particular situation, it can be made

clear by a proper trademark license agreement between parent and subsidiaries. Justice Brennan observed that "the parent corporation—not the subsidiary whose every decision it controls—better fits the bill as the true owner of any [trademark] property that the subsidiary nominally possesses." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 6 USPQ2d 1897, 1905 (1988) (concurring in part and dissenting in part).

However, in this case, Furnco International Corporation, the parent company, authorized its subsidiary, the Respondent, to be the owner of the registration at issue. We have not forgotten that Furnco International Corporation is the owner of Respondent and that it could be argued that Furnco International Corporation owned the registration all along. But the application for registration and the subsequent statement of use was not filed by Furnco International Corporation. Furnco International Corporation chose to structure its business using a legally distinct subsidiary, which counts as a "person" under the Trademark Act. 15 U.S.C. § 1127, Trademark Act § 45 ("The term 'person' and any other word or term used to designate the applicant or other entitled to a benefit or privilege or rendered liable under the provisions of this Act includes … a … corporation … or other organization capable of suing and being sued in a court of law."). Such a business structure may offer some advantages, but it also comes with some strictures, and the existence of a separate and distinct legal entity (*e.g.,* in this case a limited liability company) cannot be turned on or off at will to suit the occasion. This result is merely the flip side of the principle that a parent corporation is not liable for the wrongs of its subsidiary absent disregard of corporate separateness, such as an "alter ego" relationship. *See generally*

*A. Stucki Co. v. Worthington Indus., Inc.*, 849 F.2d 593, 7 USPQ2d 1066, 1068 (Fed. Cir. 1988). Furnco International Corporation formed, maintained and controlled Respondent as a separate legal entity, and Respondent, not Furnco International Corporation, filed the NOBLE HOUSE application, asserting that it had a *bona fide* intention to use the mark in commerce, as well as the subsequent statement of use asserting that it actually had used that mark in commerce.

Because Furnco International Corporation (i) uses the NOBLE HOUSE mark, (ii) controls Respondent (and not vice versa) and (iii) has no agreements with Respondent concerning the use of the NOBLE HOUSE mark, and (iv) controls the nature and quality of the furniture sold and/or intended to be sold under the mark, the use of the NOBLE HOUSE mark by Furnco International Corporation does not inure to the benefit of Respondent, as registrant, because Furnco International Corporation does not meet the definition of a related company (*i.e.,* an entity whose use of the mark is controlled by the registrant of the mark with respect to the nature and quality of the goods). Accordingly, the advertising and marketing materials that identify Furnco International Corporation as the source of the NOBLE HOUSE furniture products cannot be deemed use of the mark by Respondent and cannot show that Respondent intended to resume use of the NOBLE HOUSE mark.[50]

In view of the foregoing, we find that Respondent abandoned the NOBLE HOUSE mark by three years nonuse with no intent to resume use.

---

[50] Our conclusion is consistent with the prohibition on substitution of a parent-company owner when an application is filed in the name of a wholly-owned subsidiary but the parent company actually owns the mark. *See* TMEP § 1201.02(c) (October 2015).

## V. Fraud

For purposes of completeness, we turn to Petitioner's fraud claim set forth in Paragraph Nos. 11-20 of the second amended petition to cancel.[51] Fraud in procuring a trademark registration occurs when an applicant for registration knowingly makes a false, material representation of fact in connection with an application to register with the intent of obtaining a registration to which it is otherwise not entitled. *In re Bose Corp.*, 580 F.3d 1240, 1245, 91 USPQ2d 1938, 1939-40 (Fed. Cir. 2009); *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 1 USPQ2d 1483, 1484 (Fed. Cir. 1986). Fed. R. Civ. P. 9(b) provides that the circumstances constituting the alleged fraud shall be stated with particularity. *See also King Automotive, Inc. v. Speedy Muffler King, Inc.*, 667 F.2d 1008, 212 USPQ 801, 803 (CCPA 1981) (stating that "the pleadings [must] contain explicit rather than implied expressions of the circumstances constituting previous fraud"). Intent to deceive is an indispensable element of the analysis in a fraud case. *See In re Bose Corp.*, 91 USPQ2d at 1941. As such, intent to deceive the USPTO, whether to obtain a registration or to maintain a registration, is an element to be pleaded in a fraud claim. Nonetheless, intent, as a condition of mind of a person, may be averred generally. Fed. R. Civ. P. 9(b). *See also DaimlerChrysler Corp. v. American Motors Corp.*, 94 USPQ2d 1086, 1088 (TTAB 2010).

In support of its Statement of Use, Respondent submitted as a specimen a photograph of a package bearing the NOBLE HOUSE mark. Petitioner charges that Respondent had not sold the product depicted, and "had not used the mark in the

---

[51] 24 TTABVUE 8-10.

manner as depicted in the specimen image for more than two years," so "the specimen attached to the Statement of Use did not accurately depict use of the mark in commerce by the [Respondent] identified in the Statement of Use at the time of filing the Statement of Use."[52]

Petitioner did not adequately plead its fraud claim because it did not allege that Respondent knowingly submitted an inaccurate specimen of use *with the intent to deceive the USPTO*. As noted above, intent is an essential element of a fraud claim that is required to be pleaded. Nevertheless, Respondent did not challenge the pleading and, in fact, in its brief, Respondent identified fraud as one of the issues in this case.[53]

Although the fraud claim is supposed to be pleaded with particularity, Petitioner's pleading is not a model of clarity. We construe the fraud claim as comprising the allegations that (i) it was not Respondent that made the sale of the bathroom vanity depicted in the specimen and (ii) the bathroom vanity depicted in the specimen which was supposed to show the mark "as used in commerce" had not been sold or transported in commerce for more than two years. Thus, we agree with Petitioner that the purported material misrepresentations include "[i] that [Respondent] was using the mark 'on the packaging of and containers for goods, in displays associated

---

[52] Second Amended Petition for Cancellation ¶¶17-20 (24 TTABVUE 8-10).

[53] 53 TTABVUE 8.

with the goods, on tags or labels affixed to goods and in other ways customary in the trade,' [and [ii]] that [Respondent] had used the mark at all."[54]

We do not agree with Petitioner that the material misrepresentations include "(a) that the specimen was of an actual product with the mark imprinted on the packaging therefor that moved in commerce at least as early as December 3, 2010, (b) that the use in commerce was use by Defendant and Defendant was not relying on 'related company' use, … and (e) that [Respondent] was the owner of the mark."

First, with respect to the claim that the specimen did not depict an actual product, this allegation is not a reasonable interpretation of Petitioner's pleading. Paragraph No. 18 is not an explicit expression of that particular circumstance constituting the allegedly fraudulent material misrepresentation. *See King Automotive, Inc. v. Speedy Muffler King, Inc.*, 212 USPQ at 803. Thus, Respondent was not put on notice that the fraud claim included an allegation that the bathroom vanity depicted in the specimen was not an actual product sold under the mark, as alleged by the statement of use and accompanying specimen.

Second, "[t]he USPTO does not require an application to specify if the applied-for mark is not being used by the applicant but is being used by one or more related companies whose use inures to the benefit of the applicant under §5 of the Act." TMEP § 1201.03(a) (October 15, 2015). If the USPTO does not require an applicant to specify that the use of the mark is by a related company, then Respondent's failure to disclose that it was relying on use by a related company is not a material misrepresentation.

---

[54] 50 TTABVUE 26.

Finally, in denying Petitioner's motion to amend the petition for cancellation, we rejected as untimely Petitioner's allegation that Respondent was not the owner of the mark. Since Respondent's non-ownership was neither pleaded nor tried by implied consent it does not constitute a separate claim or a basis for the insufficiently pleaded fraud claim.

We turn now to the following questions: (1) whether Respondent's reliance on the sale of the bathroom vanity by Furnco International Corporation rather than by Respondent constitutes fraud and (2) whether Respondent's submission of a specimen of use displaying the mark on a product for a sale occurring two years prior to the filing of the Statement of Use constitutes fraud. We have already dealt with the issue of whether Petitioner's allegation that Furnco International Corporation, rather than Respondent, sold the bathroom vanity depicted in the specimen of use is a material misrepresentation.

We now turn to whether the specimen of use (*i.e.*, packaging of the bathroom vanity displaying the NOBLE HOUSE mark) which was supposed to show the mark "as used in commerce" but had not been used in commerce for such product for more than two years prior to the filing date of the statement of use, is a material misrepresentation and made with the intent to deceive the USPTO. The specimen of use was a photograph of the packaging for the bathroom vanity sold to Lowes on July 14, 2009 displaying the NOBLE HOUSE mark. Without taking a position as to whether or not the parent corporation's promotional activities constituted use sufficient to support a statement of use, we find that Respondent did not knowingly

make a material misrepresentation because it held the mistaken belief that, whatever the legal significance of its parent's activities, they inured to Respondent's benefit. Therefore, Respondent did not intend to deceive the USPTO.

In view of the foregoing, the fraud claim is dismissed.

**Decision**: The petition to cancel Registration No. 4049441 on the ground of abandonment is granted.